UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
EDDIE CRUZ,                                    :        09 Civ. 6982 (GWG)

                    Plaintiff,                 :        OPINION AND ORDER

      -v.-                                     :

LEVIEV FULTON CLUB, LLC,                        :

                    Defendant.                 :
----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Eddie Cruz contracted to purchase a condominium unit in a building on Fulton

Street in Manhattan from Leviev Fulton Club, LLC ("LFC"), a residential real estate developer.

Cruz failed to close and sued LFC under the Interstate Land Sales Full Disclosure Act (the

"ILSA"), 15 U.S.C. § 1701 et seq., seeking to rescind the contract and recover his down

payment.  LFC counterclaimed against Cruz seeking to retain the down payment.

        LFC has now moved for summary judgment dismissing Cruz's claims and for judgment

against Cruz on one of its counterclaims.  The parties have consented to this matter being

decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons

stated below, the Court concludes that LFC has not shown either that it is in compliance with the

ILSA or that it comes within any exception to the statute.  Thus, LFC is not entitled to retain

Cruz's down payment or to obtain dismissal of Cruz's cause of action under the ILSA.

I.      BACKGROUND

        A.      The ILSA

        The ILSA was "designed to prevent false and deceptive practices in the sale of

unimproved tracts of land by requiring developers to disclose information needed by potential

buyers." Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976). It

"'imposes detailed disclosure requirements upon land developers and prohibits fraud in interstate

land transactions.'" Aboujaoude v. Poinciana Dev. Co. II, 509 F. Supp. 2d 1266, 1269 (S.D. Fla.

2007) (quoting Armbrister v. Roland Int'l Corp., 667 F. Supp. 802, 811 (M.D. Fla. 1987)).

While the ILSA's text refers to the sale of "lots," 15 U.S.C. §§ 1703(a)(1), 1702(a), its

protections apply to the sale of condominiums as well. See, e.g., Beauford v. Helmsley, 740 F.

Supp. 201, 209-10 (S.D.N.Y. 1990); Schatz v. Jockey Club Phase III, Ltd., 604 F. Supp. 537,

541 (S.D. Fla. 1985); accord Bodansky v. Fifth on the Park Condo, LLC, 2010 WL 334985, at *2

n.6 (S.D.N.Y. Jan. 29, 2010). The ILSA entitles a successful plaintiff to "damages, specific

performance, or such other relief as the court deems fair, just, and equitable." 15 U.S.C.

§ 1709(a). The plaintiff's recovery may also include "interest, court costs, and reasonable

amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot." Id.

§ 1709(c).

Under the ILSA, it is unlawful for a developer to sell a lot "unless a statement of record

with respect to such lot is in effect" or "a printed property report . . . has been furnished to the

purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or

lessee." Id. §§ 1703(a)(1)(A)-(B). If a developer fails to comply with these requirements, a

purchaser has the right to rescind the agreement to purchase and to obtain return of his down

payment. See id. § 1703(c), (e). Here, it is undisputed that LFC failed to file a statement of

record for the condominium unit and failed to provide Cruz with a written property report prior

to the execution of the Purchase Agreement. See Defendant's Amended Statement of Material

Facts, filed Feb. 17, 2010 (Docket # 25) ¶¶ 16, 17.

2

Nonetheless, the ILSA has exemptions that remove a developer from its ambit.  LFC relies on the following exemption:

> Unless the method of disposition is adopted for the purpose of evasion of this chapter, the provisions of this chapter shall not apply to . . . the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years.

15 U.S.C. § 1702(a)(2) (emphasis added).

Accordingly, the question in this case is whether LFC was obligated by its contract with Cruz to erect the building containing Cruz's condominium unit within two years of June 22, 2007, the date of Cruz's contract with LFC.

      B.      Facts

            1.      The Offering Plan

LFC is the sponsor of the condominium project, which is located at 111 Fulton Street, New York, New York.  See Affidavit of Joseph Klaynberg, filed Feb. 12, 2010 (Docket # 18) ("Klaynberg Aff.") ¶ 8.  On June 1, 2007, LFC filed an "Offering Plan" with the New York Department of Law.  See Affidavit of Jeremy S. Doster, filed Feb. 12, 2010 (Docket # 17) ("Doster Aff.") ¶ 8; Ex. 1.  The Offering Plan stated that after the plan was declared effective, closings could be scheduled upon 30 days notice to purchasers.  Id. ¶ 12; Offering Plan: Procedure to Purchase (annexed as Ex. 2 to Doster Aff.), at 73.  However, before a closing could occur, the New York City Department of Buildings had to issue a Temporary Certificate of Occupancy.  See Doster Aff. ¶ 16; Klaynberg Aff. ¶ 16; Offering Plan: Rights and Obligations of Sponsor (annexed as Ex. 5 to Doster Aff.).  LFC anticipated that the first closing would occur on April 1, 2008, and this estimate was included in the "Procedure to Purchase" section of the

Offering Plan.  See Doster Aff. ¶¶ 13, 14; Offering Plan: Procedure to Purchase at 74; Klaynberg

Aff. ¶ 10.  Specifically the Offering Plan provided that:

> It is anticipated that the First Closing will occur by [April 1, 2008]. In the event
> the project commencement date of the Condominium operation is twelve (12)
> months or later than the anticipated date of the First Closing, Sponsor will offer
> all Purchasers the right to rescind their Purchase Agreements and have their
> Down Payments refunded to them.  In the event that the project commencement
> date of Condominium operation is six (6) months later than the anticipated date of
> the First Closing, the Plan will be amended to include a revised budget disclosing
> the then current budget projections.

Offering Plan: Procedure to Purchase at 74; see Schedule B Projected Budget (annexed as Ex. 3

to Doster Aff.).

The April 1, 2008 date was also included in a section entitled "Rights and Obligations of

Sponsor."  Doster Aff. ¶ 16; Offering Plan: Rights and Obligations of Sponsor at 96; Klaynberg

Aff. ¶¶ 10-11.  The provision also references a date on which the building would be

"substantially completed," which is discussed in greater detail Section III.B below.  Specifically,

the Offering Plan stated:

> Under the present construction schedule, it is anticipated that, except for finishing
> work to stairways, hallways and other areas of the Building which are not
> intended for the exclusive use of any one Unit Owner and specialized work, if
> any, which Sponsor agrees to perform in individual Units at the request of
> Residential Unit Owners, a first temporary certificate of occupancy could be
> issued on or about April 1, 2008 and the Building will be substantially completed
> on or about April 1, 2008, subject to Unavoidable Delays.  Neither Sponsor nor
> its principals, managers, members, agents, designees, employees or affiliates,
> however, make any warranty or representation as to the date of substantial
> completion or the issuance of the first temporary certificate of occupancy.

Offering Plan: Rights and Obligations of Sponsor at 96.[1]  In another section, the Offering Plan

---

[1] "Unavoidable delays" were defined in the Offering Plan as:

delays due to strike, lockout, or other labor or industrial disturbance (whether or

4

stated that "[n]o assurance can be given by Sponsor with regard to the accuracy of any projected completion dates set forth herein." Offering Plan Excerpts (annexed as Ex. D to Declaration of Martin G. Dobin, filed Mar. 9, 2010 (Docket # 32) ("Dobin Decl.")), at 5.

LFC also agreed that it would "diligently, expeditiously and at its sole cost and expense, perform or cause to be performed such work, and will supply or cause to be supplied all materials, necessary to complete construction of the Building substantially in accordance with the Plans and Specifications." Offering Plan: Rights and Obligations of Sponsor at 96. No date was attached to this obligation, however.

2.    The Purchase Agreement between LFC and Cruz

On June 22, 2007, LFC and Cruz entered into a written purchase agreement for the sale of Unit 604 ("the Unit") for $555,000. Doster Aff. ¶ 20; Purchase Agreement (annexed as Ex. 10 to Doster Aff.), at 1. The Offering Plan was incorporated by reference into the Purchase Agreement. Doster Aff. ¶¶ 21, 22; Purchase Agreement at 1, 5. Cruz made a down payment of $55,500. Doster Aff. ¶ 25; Purchase Agreement at 1. The Purchase Agreement provided that, in the event of Cruz's default, LFC had the right to "retain all sums deposited by Purchaser . . . together with interest earned thereon, as liquidated damages" after giving 30 days written

---

not on the part of employees or contractors of Sponsor), civil disturbance, future order of any government, court or regulatory body claiming jurisdiction, war, act of the public enemy, riot, sabotage, blockade, embargo, terrorist acts, shortage of or failure or inability to secure materials or labor by reason of priority or similar regulation or order of any government or regulatory body or lightning, earthquake, fire, storm, hurricane, flood, explosion, act of God, any delays in governmental approvals in connection with the construction or any cause similar to any of the causes hereinabove stated.

Doster Aff. ¶ 18; Offering Plan: Certain Definitions (annexed as Ex. 6 to Doster Aff.), at 25.

notice and an opportunity to cure the default.  Purchase Agreement at 6.

            3.     LFC's Attempt to Close the Transaction

On October 16, 2008, LFC sent written notice to Cruz that it had scheduled a closing on

the Unit for December 17, 2008.  Doster Aff. ¶ 30; Letter from Melissa Gabriellini to Eddie

Cruz, dated Oct. 16, 2008 (annexed as Ex. 14 to Doster Aff.).  On December 17, 2008, the

scheduled closing date, LFC was ready, willing, and able to perform, Doster Aff. ¶¶ 33, 34, but

Cruz failed to appear or tender performance, id. ¶ 35.  On January 30, 2009, LFC sent notice to

Cruz that he was in default and that if he failed to cure his default by closing on or before March

5, 2009, LFC had the option to cancel the Purchase Agreement and retain Cruz's down payment

as liquidated damages.  Id. ¶ 36; Letter from Jeremy S. Doster to Eddie Cruz, dated Jan. 30, 2009

(annexed as Ex. 20 to Doster Aff.).  Cruz failed to cure his default by attending a closing and

tendering his performance.  Doster Aff. ¶ 40.  On March 11, 2009, LFC sent written notice to

Cruz cancelling the Purchase Agreement and informing him of LFC's intention to keep the down

payment as liquidated damages.  Doster Aff. ¶ 41; Letter from Jeremy S. Doster to Eddie Cruz,

dated Mar. 11, 2009 (annexed as Ex. 25 to Doster Aff.).

         C.     Procedural History

Cruz filed the instant action on August 6, 2009, seeking rescission of the Purchase

Agreement, return of his $55,500 down payment plus interest, compensatory damages,

reasonable attorneys fees and costs, and pre- and post-judgment interest.  See Complaint, filed

Aug. 6, 2009 (Docket # 1) ("Compl.") ¶ 56.  In his first cause of action, Cruz asserts that LFC

violated the ILSA by failing to file Statements of Record with the Department of Housing and

Urban Development ("HUD") or provide him with a copy of a HUD Property Report, as is

6

required by the ILSA, thus entitling Cruz to revoke the Purchase Agreement and recover his down payment. Id. ¶¶ 26, 27, 32, 54. Cruz's second cause of action states that Cruz was unable to close the transaction because he was the victim of an "investment fraud," and therefore, he "should not be penalized for his inability to close the transaction." Id. ¶ 55. The second cause of action does not identify under what statute or other basis it arises.

LFC's answer to the complaint asserts two counterclaims for breach of contract based on Cruz's two failures to close on the unit. See Answer with Counterclaims, filed Aug. 25, 2009 (Docket # 4) ("Answer") ¶¶ 61-83. LFC seeks the same relief in each counterclaim: retention of the $55,500 down payment as liquidated damages, as well as interest, legal fees, costs, and disbursements. Id. ¶¶ 79, 83.

On February 12, 2010, LFC moved for summary judgment seeking dismissal of Cruz's claims and an award of monetary relief on its second counterclaim. See Notice of Motion, filed Feb. 12, 2010 (Docket # 16); Doster Aff.; Klaynberg Aff.; Affidavit of Yevgeny Tsyngauz, filed Feb. 12, 2010 (Docket # 19); Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed Feb. 12, 2010 (Docket # 20) ("Def. Mem."), at 26; Defendant's Amended Statement of Material Facts, filed Feb. 17, 2010 (Docket # 25). Cruz filed opposition papers. See Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, filed Mar. 5, 2010 (Docket # 28) ("Pl. Opp. Mem."); Dobin Decl.; Plaintiff's Statement of Material Facts, filed Mar. 9, 2010 (Docket # 31). LFC filed a reply memorandum. See Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment, filed Mar. 12, 2010 (Docket # 33).

In addition, the parties submitted supplemental materials in response to an Order of this

Court, see Order, filed Mar. 25, 2010 (Docket # 34), seeking briefing on certain provisions in the

Offering Plan. See Letter from Martin G. Dobin, dated Mar. 26, 2010 (Docket # 40);

Supplemental Memorandum of Law in Further Support of Defendant's Motion for Summary

Judgment, filed Apr. 1, 2010 (Docket # 36) ("Def. Supp. Mem."); Letter from Michael Treybich,

dated Apr. 8, 2010 (Docket # 38); Letter from Martin G. Dobin, dated Apr. 8, 2010 (Docket

# 37); Letter from Michael Treybich, dated Apr. 8, 2010 (Docket # 39).

II.     LAW GOVERNING SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is

appropriate when "the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A genuine issue of material

fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of

fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

When determining whether a genuine issue of material fact exists, courts must resolve all

ambiguities and draw all factual inferences in favor of the non-moving party.  Id. at 255 (citing

Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving

party has shown that there is no genuine issue as to any material fact and that it is entitled to a

judgment as a matter of law, "the nonmoving party must come forward with 'specific facts

showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on

conclusory allegations or unsubstantiated speculation," Jeffreys v. City of N.Y., 426 F.3d 549,

554 (2d Cir. 2005) (citation omitted).  In other words, the non-movant must offer "concrete

evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (citation, internal quotation marks, and brackets omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citation omitted); accord Feurtado v. City of N.Y., 337 F. Supp. 2d 593, 599-600 (S.D.N.Y. 2004).

III.    DISCUSSION

A.    Laws Governing Interpretation of the ILSA

To determine whether the contract here qualified LFC for the two-year exemption, we must decide whether Cruz's purchase agreement was a "contract obligating [LFC] to erect . . . [the] building . . . within a period of two years" of the sale, or by June 22, 2009. 15 U.S.C. § 1702(a)(2). We look to federal law for purposes of construing the ILSA and to state law for purposes of construing the obligations of the contract. See, e.g., Jankus v. Edge Investors, L.P., 650 F. Supp. 2d 1248, 1254 (S.D. Fla. 2009) ("Although federal law governs interpretation of ILSA, state contract law governs whether a contract obligates a seller to build within two years."); accord Stein v. Paradigm Mirasol, LLC, 586 F.3d 849, 854 (11th Cir. 2009), cert. denied, 2010 WL 285697 (Mar. 22, 2010); Winterrowd v. Taylor Morrison Servs., Inc., 2009 WL 2149239, at *2 (M.D. Fla. July 16, 2009); see also Pilato v. Edge Investors, L.P., 609 F. Supp. 2d 1301, 1307 (S.D. Fla. 2009) ("Whether a contract 'obligates' a seller to erect a

9

building within two years is a question of state contract law." (citation omitted)).

Under federal law, a term not defined by a statute carries its ordinary meaning.  Perrin v. United States, 444 U.S. 37, 42 (1979).  The term "obligating" means "binding by legal . . . duty." Stein, 586 F.3d at 854 (collecting definitions).  Thus, the ILSA two-year "exemption applies when a contract imposes a legal duty on the developer to perform his promise to construct the condominium . . . within two years."  Id.; accord Zambrano v. Indian Creek Holding, LLC, 2009 WL 1585980, at *3 (S.D. Fla. June 4, 2009) ("a developer is exempt from the requirements of ILSA when the contract contains an unconditional commitment by the developer to complete the condominium units within two years").[2]

B.     Analysis

The Purchase Agreement was signed by Cruz on June 22, 2007, Purchase Agreement at 1, and thus for purposes of the exemption, the sale of the Unit occurred on that date.  See

---

[2] Both Cruz and LFC have cited to HUD regulations and Guidelines relating to the two-year obligation-to-build exemption.  See, e.g., Def. Mem. at 9; Pl. Opp. Mem. at 5.  The HUD guidelines state that "the contract must not allow nonperformance by the seller at the seller's discretion. . . . Similarly, contracts that directly or indirectly waive the buyer's right to specific performance are treated as lacking a realistic obligation to construct."  Guidelines for Exemptions Available Under the ILSA, 61 Fed. Reg. 13596, 13603; see also Atteberry v. Maumelle Co., 60 F.3d 415, 420 (8th Cir. 1995) (same), cert. denied, 516 U.S. 1074 (1996); Winterrowd, 2009 WL 2149239, at *2-3 (same).  The Guidelines also state that "[c]ontract provisions which allow for nonperformance or for delays of construction completion beyond the two-year period are acceptable if such provisions are legally recognized as defenses to contract actions in the jurisdiction where the building is being erected."  Id.  On the latter point, case law recognizes that force majeure clauses in a contract that excuse an obligation to build do not disqualify the contract from the exemption.  See, e.g. Jankus, 650 F. Supp. 2d at 1255-56 (collecting cases).

While HUD's interpretations of the ILSA have been found by courts to be useful in construing that statute, see, e.g., Bodansky, 2010 WL 334985, at *5-6, they are not necessary to our disposition of this case.

Markowitz v. Ne. Land Co., 906 F.2d 100, 104 (3d Cir. 1990) (the "sale occurs when the

purchaser signs the sale agreement and incurs an obligation") (collecting cases).  Thus, to come

within the exemption, LFC must show that it was contractually obligated to "erect" the Unit by

June 22, 2009.

LFC argues, Def. Mem. at 19-20, 21, that the following two provisions bound it to erect

the Unit before June 22, 2009.  We will refer to the first provision as the "Procedure to Purchase

Provision" and the second provision as the "Rights and Obligations of Sponsor Provision."

### Procedure to Purchase

It is anticipated that the First Closing will occur by [April 1, 2008].  In the event
the project commencement date of Condominium operation is twelve (12) months
or later than the anticipated date of the First Closing, Sponsor will offer all
Purchasers the right to rescind their Purchase Agreements and have their Down
Payments refunded to them.

Offering Plan: Procedure to Purchase at 74.

### Rights and Obligations of Sponsor

Under the present construction schedule, it is anticipated that . . . a first temporary
certificate of occupancy could be issued on or about April 1, 2008 and the
Building will be substantially completed on or about April 1, 2008, subject to
Unavoidable Delays.  Neither Sponsor nor its principals, managers, members,
agents, designees, employees or affiliates, however, make any warranty or
representation as to the date of substantial completion or the issuance of the first
temporary certificate of occupancy.

Offering Plan: Rights and Obligations of Sponsor at 96.

On their face, there is nothing in these provisions to suggest that LFC was "[bound] by

legal . . . duty," Stein, 586 F.3d at 854, to erect the building by June 22, 2009.  The Procedure to

Purchase Provision merely grants purchasers the right to rescind their agreements and get their

down payments refunded if the project commencement date is April 1, 2009 or later.  Nothing in

its language provides that LFC must build the project by April 1, 2009. Rather, it creates a remedy for the purchaser "[i]n the event" that the project is not completed by April 1, 2009. That remedy is limited to the rescission of the Purchase Agreement and refund of the down payment. Thus, this clause does not create an "obligation to build" the Unit by the April 1, 2009 date. See Dorchester Dev., Inc. v. Burk, 439 So. 2d 1032, 1034 (Fla. 3d Dist. Ct. App. 1983) (contract provision that gave "the purchasers an option to cancel the contracts and receive back their deposits in the event the condominium units were not erected" by a date certain insufficient to come within the two-year ILSA exemption).

The Rights and Obligations of Sponsor Provision similarly does not bind LFC to a legal duty to erect the Unit. It merely states that "it is anticipated" that the building will be completed by April 1, 2008. See, e.g., Zambrano, 2009 WL 1585980, at *3 (two-year exemption not applicable where contract "estimated" the date of completion). And if it was not already obvious that this clause did not create a legal obligation to build the unit by a certain date, the next sentence makes clear that LFC made no "warranty or representation as to the date" of substantial completion of the project. Finally, elsewhere in the Offering Plan, LFC explicitly states that "[n]o assurance can be given by the Sponsor with regard to the accuracy of any projected completion dates set forth" in the Plan. Offering Plan (annexed as Ex. D to Dobin Decl.), at 5.

LFC argues that it bound itself contractually to build within the two years because the clause "it is anticipated that" in the Rights and Obligations of Sponsor Provision modifies only the phrase that reads "a first temporary certificate of occupancy could be issued on or about April 1, 2008." (We will refer to this as the "first phrase.") LFC argues that the "it is anticipated that" clause does not modify the phrase that reads "the Building will be substantially

12

completed on or about April 1, 2008" (which we refer to as the "second phrase") because the word "will" has a "mandatory" quality, and therefore, the word "anticipated" would be contradictory. Def. Supp. Mem. at 13. But the word "will" does not necessarily reflect a mandatory quality. To the contrary, the word "will" is commonly used as an auxiliary verb to construct the future tense (for example, "it will snow tomorrow") without any sense of the verb constituting a command. Thus, to say that "it is anticipated that the building will be completed on April 1" is a perfectly natural way of expressing a belief, as well as a lack of certainty, as to the date in the future when the building will be completed.

LFC views the clause "subject to unavoidable delays" as applying only to the second phrase. It then argues that under Cruz's proposed construction, the "subject to unavoidable delays" clause is "excess verbiage." Def. Supp. Mem. at 14. But even if LFC is correct that the "subject to unavoidable delays" clause applies only to the second phrase, a party might choose to explain that even an "anticipated" completion date could be affected by the specific "unavoidable delays" that are spelled out in the contract, such as strikes and embargoes. See Offering Plan: Certain Definitions at 25. Thus, the mention of "unavoidable delays" does not detract from the most obvious reading of this sentence. Indeed, it is LFC's proposed construction that results in "excess verbiage." If the "it is anticipated that" clause modifies only the first phrase, then "it is anticipated that" is unnecessary because the first phrase already uses a non-mandatory verb form: "could."[3]

---

[3] LFC also argues that if "it is anticipated that" modifies both phrases, it is illogical that the first phrase uses "could" and the second phrase uses "will." Def. Supp. Mem. at 13-14. Whatever illogic may inhere in this construction, however, does not alter the plain structure of the sentence. In any event, there is perhaps an explanation for the use of two different auxiliary verbs. The first phrase refers to a certificate of occupancy, which can only be issued by a city

13

Finally, LFC would be in no better position even if the second phrase could be read to stand alone.  This is because it is followed by a sentence that makes clear that, notwithstanding the previous sentence, LFC was making no "warranty or representation as to the date of substantial completion."  Given this "no warranty" sentence, it is impossible to imagine how LFC was under any obligation by contract to construct the building by April 1, 2008.

LFC has no real argument to offer on this point.  Indeed, towards the end of its supplemental briefing, it appears to concede that "[t]he purpose of [the "no warranty" sentence] is to limit the Defendant's liability for failure to meet this first deadline of April 1, 2008."  <u>See</u> Def. Supp. Mem. at 14.  Instead, LFC switches tack and points out that the "no warranty" sentence did not "limit the Plaintiff's ability to sue to enforce Defendant's promise to build both "diligently" and "expeditiously."  <u>Id.</u> (quoting Rights and Obligations of Sponsor at 96).  But the promise to build  "diligently" and "expeditiously" is of no help to LFC because it does not contain any fixed date for completion of the building.  Thus, it is unenforceable on its own terms.  And, inasmuch as the "no warranty" sentence specifically refers to the fact that no warranty was being made "as to the date of substantial completion," it has no bearing on the promise to build "diligently" and "expeditiously."

To the contrary, the "no warranty" sentence's obvious purpose is to negate any perceived

---

agency.  <u>See</u> N.Y. City Admin. Code § 28-118.1; <u>Byrne v. Bd. of Standards & Appeals of N.Y.</u>, 5 A.D.3d 261, 265 (1st Dep't 2004).  Thus, LFC might naturally use more conditional language to describe that eventuality than it would use for "substantially completed" – an event that was within its exclusive control.

Similarly the Court rejects LFC's argument that Cruz's proposed reading makes the phrase "on or about April 1, 2008" superfluous the first time it is used.  <u>See</u> Def. Supp. Mem. at 13-14.  The repetition of the phrase makes the sentence much less awkward than it would be without the repetition.

obligation on LFC's part to build by April 1, 2008. The "no warranty" sentence refers

specifically to the dates for both "substantial completion" and "the issuance of the first

temporary certificate of occupancy." These are precisely the two subject areas with which the

April 1, 2008 date is associated in the previous sentence. Thus, the "no warranty" sentence

refers to the preceding sentence and not to the generic "diligently" and "expeditiously"

provision, which contains no date at all. And, if all this were not enough, a separate section of

the Offering Plan states that "[n]o assurance can be given by Sponsor with regard to the accuracy

of any projected completion dates set forth herein." Offering Plan Excerpts (annexed as Ex. D to

Declaration of Martin G. Dobin, filed Mar. 9, 2010 (Docket # 32) ("Dobin Decl.")), at 5.[4]

Of course, parties that wish to bind themselves to build within two years can easily do so

by using mandatory language such as "shall" or "agrees to" – or even "will," provided it is not

---

[4] In an alternative argument made for the first time in its supplementary briefing, Def. Supp. Mem. at 16, LFC seeks to have the court imply a reasonable time for its obligation to build the Unit. See, e.g., Teramo & Co., Inc. v. O'Brien-Sheipe Funeral Home, Inc., 283 A.D.2d 635, 636 (2d Dep't 2001) (court will imply a "reasonable time" for performance in a construction contract where none is present, based on "the facts and circumstances of the particular case, including the subject matter of the contract, the situation of the parties, their intention, what they contemplated at the time the contract was made, and the circumstances surrounding performance") (internal citations omitted). But in light of the fact that the ILSA exemptions are to be "narrowly construed," Markowitz, 906 F.2d at 105, we do not believe that the specific language of the ILSA exemption – requiring that there be an enforceable obligation to build by a date certain – could be satisfied through a court's implication of a date for performance where no such date is contained in the contract itself, see generally Jankus, 650 F. Supp. 2d at 1253 ("In light of its remedial objectives, ILSA must be applied liberally in favor of broad coverage, with its exemptions narrowly construed, to ensure that Congress's essential purpose in enacting its remedial provisions is not frustrated."); accord Rensin v. Juno-Loudon, LLC, 2010 WL 1381546, at *4 (E.D. Va. Mar. 30, 2010) (collecting cases). In any event, given that the two-year period ended on June 22, 2009; that LFC stated only that it "anticipated" that there would be substantial completion by April 1, 2009; and that LFC specifically disclaimed any representation as to the date of substantial completion, there is no basis on which to conclude that a New York court would construe the Purchase Agreement and Offering Plan as containing an enforceable obligation to build by June 22, 2009.

modified by a clause such as "it is anticipated that." And case law under the ILSA routinely recognizes the effectiveness of such language as placing a builder within the exemption. See, e.g., Ndeh v. Midtown Alexandria, L.L.C., 300 F. App'x 203, 205 (4th Cir. 2008) ("[seller] shall complete the unit . . . within twenty-four months after the date [Purchaser] signs [the contract]") (citations omitted and internal punctuation altered); Kamel v. Kenco/The Oaks at Boca Raton LP, 321 F. App'x 807, 810 (11th Cir. 2008) ("Seller does, however, agree to substantially complete construction of the Home in the manner specified in this Agreement by a date no later than one (1) year and eleven (11) months from the date Buyer and Seller execute this Agreement . . . ."); Pilato, 609 F. Supp. 2d at 1306 ("Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date no later than two (2) years from the date Buyer signs this Agreement . . . ."); Pellegrino v. Koeckritz Dev. of Boca Raton, LLC, 2008 WL 6128748, at *1-2 (S.D. Fla. July 10, 2008) ("In any event, Seller shall complete the construction of the House within two (2) years (the time limitation required to insure Seller's exemption under Section 1702(a)(2)) . . . ."). But no language mandating construction by June 22, 2009 appears anywhere in Cruz's purchase documents. Accordingly, LFC was not exempt from the ILSA's requirements with respect to Cruz's purchase.

C.    Plaintiff's Second Cause of Action

Cruz's second cause of action, in which he states that he "should not be penalized for his inability to close the transaction with" LFC due to his own financial troubles, Compl. ¶ 55, relies on no statute or common law claim for relief. Because it does not even state a claim upon which relief can be granted, LFC is entitled to summary judgment dismissing this claim.

    D.    <u>Defendant's Counterclaim</u>

In its counterclaims for breach of contract based on the failure to close, LFC seeks to retain the $55,500 down payment as liquidated damages, and interest earned thereon, together with legal fees, costs, and disbursements based on Cruz's alleged breach of the Purchase Agreement by failing to close on the Unit.  <u>See</u> Answer ¶¶ 78, 79, 82, 83.  Certainly, as LFC argues, a seller is entitled to retain a deposit paid by a would-be buyer who is not lawfully excused from performance, as long as the seller is ready, willing, and able to convey the property.  <u>See</u> <u>In re Hicks</u>, – N.Y.S.2d –, 2010 WL 1715333, at *2 (2d Dep't Apr. 27, 2010); <u>accord</u> <u>Maxton Builders, Inc. v. Lo Galbo</u>, 68 N.Y.2d 373, 378 (1986), <u>Sassower v. Blumenfeld</u>, 24 Misc. 3d 843, 847 (N.Y. Sup. Ct. 2009).  And financial difficulty or insolvency will not excuse a party's nonperformance.  <u>See</u> <u>Sassower</u>, 24 Misc. 3d at 846-47 (collecting cases).  Here, it is undisputed that LFC was ready, willing, and able to close.  <u>See</u> Doster Aff. ¶¶ 33-35, 38-40.  Thus, if the contract were otherwise proper, Cruz breached the Purchase Agreement and LFC would have had the right to "retain all sums deposited by Purchaser . . . together with interest earned thereon, as liquidated damages."  Purchase Agreement at 6.

The Court cannot grant summary judgment for LFC's claim for breach of contract, however, because Cruz's rights under the ILSA permit him to rescind the contract as well as to obtain other relief including the return of his down payment.  Accordingly, LFC's motion for summary judgment with respect to its counterclaim is denied.

<u>Conclusion</u>

For the foregoing reasons, LFC's motion for summary judgment (Docket # 16) is denied as to Cruz's first cause of action and granted as to Cruz's second cause of action.  Summary

judgment is denied as to LFC's counterclaim.

Dated:  May 14, 2010
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

judgment is denied as to LFC's counterclaim.

Dated: May 14, 2010
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

18